IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH GUTHRIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 06-0619 |
| | ) | |
| | ) | |
| REBECCA BRADLEY, individually and | ) | |
| in her official capacity as Township | ) | |
| Manager; PAUL VARGO, individually and | ) | |
| in his official capacity as Assistant Township | ) | |
| Manager; WILLIAM G. WILSON, | ) | |
| individually and in his official capacity as | ) | |
| Commissioner of Wilkins Township; and | ) | |
| WILKINS TOWNSHIP, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

CONTI, District Judge.

In this memorandum opinion the court considers the motion for partial summary

judgment (Docket No. 48) filed by plaintiff Keith Guthrie ("plaintiff" or "Guthrie"), addressing

the sole issue of liability against defendant Wilkins Township ("Wilkins Township" or

"Township") for allegedly maintaining and enforcing a policy violative of the First Amendment

to the United States Constitution. Also pending before the court and considered in this opinion is

the motion for summary judgment (Docket No. 52) filed by defendants Rebecca Bradley

("Bradley"), Paul Vargo ("Vargo"), William G. Wilson ("Wilson")(collectively "individual

defendants") and Wilkins Township (together with "individual defendants", "defendants")

against all claims asserted by plaintiff in his amended complaint. (Docket No. 42.) After

considering the joint statements of material facts,[1] the other submissions of the parties, and based upon the undisputed facts of record, viewing all disputed facts in favor of the nonmoving party and drawing all reasonable inferences in favor of the nonmoving party, plaintiff's motion for partial summary judgment will be granted and defendants' motion for summary judgment will be denied with respect to the chain of command policy challenge, and granted in all other respects.

## Factual and Procedural Background

Wilkins Township is a body politic organized and existing under the laws of the Commonwealth of Pennsylvania and is a first class township situated in Allegheny County. (Defs.' Facts ¶ 1; Pl.'s Facts ¶ 3.) It is governed by a board of commissioners. (Defs.' Facts ¶ 2; Pl.'s Facts ¶ 4.) Wilson is a member of the board of commissioners and for a period of time was the president of the board. (Defs.' Facts ¶ 9; Pl.'s Facts ¶ 8.) The township manager is Bradley and Vargo is the assistant township manager, as well as the public works supervisor. (Defs.' Facts ¶¶ 3, 7; Pl.'s Facts ¶¶ 5, 6.) Guthrie serves as the chief of police of Wilkins Township, a position he has held since 2000. (Defs.' Facts ¶ 11; Pl.'s Facts ¶ 2.)

Certain facts referred to by the parties do not fit neatly into an organized rendering of this case's background and are not particularly germane to the disposition of the motions before the court. These facts will be described here only in order to be as inclusive as possible. First, Bradley and Vargo enjoy a personal relationship and share a residence. (Defs.' Facts ¶ 40; Pl.'s Facts ¶ 7.) Second, prior to his election to the board of commissioners, Wilson served as the

---

[1]Plaintiff filed a joint statement of material facts in connection with his motion for summary judgment and defendants filed a joint statement of material facts in connection with the defendants' motion for summary judgment. Plaintiff's joint statement (Docket No. 70) will be referenced by the phrase "Pl.'s Facts" and defendants' joint statement (Docket No. 71) will be referenced by the phrase "Defs.' Facts."

chief of police of Wilkins Township, during which time plaintiff was a sergeant on the police force. (Defs.' Facts ¶¶ 10, 12; Pl.'s Facts ¶ 8.)  In January 1997, and February 1998, plaintiff reported to the township commissioners his concerns about certain aspects of Wilson's conduct as police chief.  (Defs.' Facts ¶¶ 13-14.)

On February 27, 2006, a memorandum was issued by the Township detailing the "chain of command" policy in effect for Wilkins Township employees.  (Defs.' Facts ¶ 23; Pl.'s Facts ¶ 18.)  The language in issue was contained in one paragraph, and stressed that, other than the Township manager, no employee was permitted to address issues to the board of commissioners, or any member of the board, without first obtaining permission from the Township manager and, for police officers and public works employees, the appropriate supervisor.  The proscription applied only to issues related to Township business and not to unrelated matters, such as social relationships between a board member and an employee.  (Pl.'s App. in Supp., Ex. 1.)  The language read as follows:

> It should be clear that, in no case, is an employee (other than the Township Manager) permitted to address issues to the Board of Commissioners (or any member thereof) without the express permission and/or knowledge of the Township Manager OR, in the case of members of the police and DPW workforce, the permission and knowledge of their immediate supervisors and the Township Manager.  Obviously, this does not include issues which are not Township business (i.e. social relationships between Board members and employees).

Id.

The purported catalysts for the issuance of the memorandum were two vaguely referenced instances of employees violating the policy by speaking directly to a commissioner.  (Defs.' Facts ¶ 24.)  According to statements attributable to the individual defendants, the chain of command

policy detailed in the February 27, 2006 memorandum did not announce a new policy, but rather reiterated an existing policy in effect "since the 1960s," and Township employees were free to neither disregard nor go outside the chain of command. (Pl.'s Facts ¶¶ 20-22; Pl.'s App. in Supp., Ex. 3, at 50-51; *Id.* Ex. 5 at 110; *Id.* Ex. 7, at 110-11, 226-27.) The February 27, 2006 memorandum was revised in April 2006, to reflect some changes suggested by the American Civil Liberties Union. (Pl.'s Facts ¶ 19.) Significantly, the language in issue did not appear in the revised version. (Pl.'s App. in Supp., Ex. 16.)

Prior to the issuance of the memorandum, plaintiff alleges numerous instances in which his attempts to speak out were thwarted. On March 14, 2000, defendant Wilson, then chief of police, issued a memorandum to "Sgt. Guthrie and all Patrol Officers" prohibiting police officers from speaking with any commissioner about police department operations while the officer was delivering mail. (Pl.'s Facts ¶ 9.) On June 23, 2005, Wilson, then president of the board of commissioners, issued a memorandum to plaintiff reminding him of the Wilkins Township chain of command policy. (*Id.* ¶ 15.) A September 21, 2005 memorandum from Bradley to plaintiff warned plaintiff not to contact the Township solicitor without Bradley's prior approval. (*Id.* ¶ 16.) On February 21, 2006, plaintiff authored a memorandum regarding a letter written by Bradley that was published in the *Pittsburgh Post-Gazette*. (Defs.' App. in Opp., Ex. 3.) By memorandum dated February 22, 2006, Bradley informed plaintiff that Bradley had removed the memorandum from the commissioners' mailboxes, and warned that any future attempts by plaintiff to submit correspondence to the solicitor or violate the chain of command by communicating with commissioners without her prior authorization would lead to disciplinary action against plaintiff. (*Id.* Ex. 4.)

Plaintiff, however, continued to express his concerns about Township practices with which he did not agree both before and after the issuance of the February 27, 2006 memorandum. (Defs.' Facts ¶ 27.) Between 2003 and 2005, plaintiff objected to several "orders" he was given by defendants Bradley, Vargo and Wilson. (*Id.* ¶ 19.) The specific orders with which plaintiff disagreed pertained to requests to "fix" tickets, an order to provide a police department key to a civilian employee, interference with police scheduling, removing a citizen from the municipal building, relinquishing a letter from a citizen and being required to write a traffic signal maintenance proposal.[2] (*Id.*)

With respect to requests to "fix tickets," plaintiff stated, "I therefore maintained my decision not to withdraw the ticket, as doing so would have been contrary to police rules and regulations." (Pl.'s App. in Opp., Ex. A ¶ 25.) Plaintiff reported the so-called "ticket-fixing" orders to the Allegheny County District Attorney and to the Federal Bureau of Investigation ("FBI") respectively in September and November 2005. (*Id.* ¶ 28.) At least partially because of these reports, plaintiff was twice suspended from duty. (*Id.*) Defendants deny knowledge about plaintiff's report to the FBI. (*Id.* ¶¶ 29, 33.)

With respect to providing a police department key, plaintiff wrote:

> I received your letter directing me to provide a key to Dave Geric giving him access to the Police Department. As we discussed yesterday, this order is in conflict with the Pennsylvania Crimes Code Section 9131 directing criminal justice agencies to provide security for criminal history record information. It also

---

[2]The parties adduced a considerable amount of discovery material purportedly establishing the validity or invalidity of the propriety of these so-called "orders," and the details underlying their issuance. It should be clear, however, at least it is to the court, that the wellspring of their dispute is of no moment. It matters not whether the orders were properly authorized and issued pursuant to a clearly defined hierarchy of power within the structure of the Township's governance. It matters only whether plaintiff's speech in opposition to the orders was thwarted to an extent implicating a Constitutional infringement.

gives access to C.L.E.A.N. information which is also against site security requirements by the PA State Police. I have also spoken with Agent Lenny Zenkel of the Attorney General's Office. He concurs that this would violate C.H.R.I.A. (Criminal History Records Information Act).

(Defs.' App. in Opp., Ex. 9.)

With respect to plaintiff's exception to Bradley's interference with police department scheduling, plaintiff testified in his deposition that scheduling was one of the duties of the chief of police. He testified as follows:

> Q. Did you have additional duties as chief?
> A. Yeah.
> Q. What were those?
> A. It would have been scheduling all of the police personnel . . . .

(Guthrie Dep. 83, May 1, 2007.)

With respect to removing a citizen from the municipal building, plaintiff's declaration describes the incident this way:

> In June 2004, a Township citizen visited my office to discuss possible drug trafficking in her neighborhood. Bradley entered my office and interrupted the conversation. Shortly thereafter, Bradley and the citizen began arguing, at which point Bradley stated that she thought the citizen should leave. The citizen left the building and I responded to an emergency call. Upon my return, Bradley reprimanded me for failing to follow her "order" to remove the citizen. She gave no such "order," and in any event, I did not believe there was a basis to force a citizen from the Township building who was discussing a Township issue and not violating any law or ordinance. I was formally reprimanded that same month for failure to follow Bradley's "order" to remove the citizen, because I should have "sensed" that Bradley wanted me to remove the citizen.

(Pl.'s App. in Opp., Ex. A. at 5-6.)

With respect to records, Wilkins Township Resolution No. 4-77, defining the duties of police department personnel in effect during the time relevant to this lawsuit, under the heading "Chief of Police," stated: "Supervises all police department records." (Defs.' App. in Opp., Ex. 14.) Plaintiff testified as follows:

> Q.    Okay.  And you supervise all police department records.
>        Is that what we talked about earlier?
> A.    Yes.
> Q.    You're responsible for maintaining the accuracy, the
>        completeness, the security of police records?
> A.    Correct.

(Guthrie Dep. 88-89.)

An article published in the *Woodland Progress* on January 25, 2006, and a letter to the editor published in the *Pittsburgh Post-Gazette* newspaper on February 16, 2006, contain statements made by Bradley that plaintiff alleges are defamatory and cast him in a false light. (*Id.* ¶¶ 34, 50.)  Plaintiff further asserts that two e-mails authored by Bradley and sent to *Post-Gazette* reporter, Bill Heltzel, with copies to various Township personnel, are likewise defamatory and cast him in a false light.  (*Id.* ¶¶ 38, 45, 50.) The first e-mail of January 5, 2006 (the "January e-mail"), discusses disciplinary action taken by the Township against plaintiff, and reads in relevant part:

> In each case where disciplinary action has been brought against the
> Chief, the reasons for this action have been documented in
> correspondence to the Chief.  It is obvious to me from this latest article
> that the Chief is trying to "spin" these issues in his favor.  I think if you
> had an opportunity to review the letters of discipline, that you would
> have a much more accurate view of why the Township has taken the
> actions that it has thus far.  Since the Chief has been so receptive to
> media attention, you may want to explore this avenue with him.  My
> bet is he will not share these documents with you.

7

> [A]pparently, the Chief feels that he can take advantage of the required
> silence of the Commissioners by relaying half-truths to the media in
> [an] attempt to gain public sympathy.

(Defs.' App. in Supp., Ex.27.)

The second e-mail, dated July 12, 2006 (the "July e-mail"), related the events occurring at

a Township meeting in relevant part as follows:

> I would ask that the following information be kept 'off the record.' I
> feel that I have been working with you long enough now that I can give
> you some of the colorful background without fear that you will print it
> in association with me. . . .
>
> You have attended enough meetings that you now know who the
> "players" are. It is obvious that Mr. Gibbons' supporters were none
> other than the wife of Mr. Hearn (lawsuit) and the daughter of Chief
> Guthrie (the Chief is out of town at training this week), as well as a
> former member of the Board of Commissioners who ran against Mr.
> Wilson. . . . Mr. Gibbons now claims to have retained the same
> attorney who is representing Guthrie in his lawsuit - is that a
> coincidence? (you might want to check on that . . . ).
>
> After Mr. Gibbons finished speaking, Mrs. Hearn and Chief Guthrie's
> daughter (as well as Gibbons) left the meeting. Mrs. Hearn was the
> voice of taxpayer concern at the meeting - demanding that the Board
> hear what Gibbons had to say. . . .
>
> This entire act was illicited [sic] for the sole purpose of trying to
> spread a little dirt. Why? Does it help the Hearns' [sic] and/or the
> Guthries' [sic] in their respective lawsuits? . . . Or, is there really some
> underlying reason why Mr. Gibbons felt the need to tell on me and
> Paul in a public forum because of the impact our actions would have
> on the public or in the performance of our duties as township
> employees?

(Defs.' App. in Supp., Ex.25.)

Plaintiff commenced the instant action by filing a complaint with this court on May 8,

2006, against Wilkins Township, Bradley, Vargo, Wilson, Frank Greco, Sylvia Martinelli and

Paul Padula asserting claims under the Pennsylvania Whistleblower Law and the First Amendment to the United States Constitution. Defendants filed a motion to dismiss on June 22, 2006, which was addressed at a motion hearing held August 15, 2006, in conjunction with a case management conference. Defendants answered plaintiff's complaint on October 6, 2006, and plaintiff filed an amended complaint on October 25, 2007, which did not name Frank Greco, Sylvia Martinelli or Paul Padula but asserted additional claims of defamation, false light invasion of privacy, defamation *per se* and civil conspiracy. On October 31, 2007, Frank Greco, Sylvia Martinelli and Paul Padula were officially terminated from this action by the court. On November 5, 2007, defendants answered plaintiff's first amended complaint. Plaintiff filed a motion for partial summary judgment on January 30, 2008, addressing only the constitutionality of the Wilkins Township chain of command policy. Defendants filed their summary judgment motion on February 4, 2008, asserting that judgment in their favor should be granted with respect to all claims raised in plaintiff's first amended complaint. Supporting and opposing submissions were filed, the court now addresses the pending motions.

## Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining

whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir.2007)("In considering the evidence, the court should draw all reasonable inferences against the moving party."). The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id.*

## Discussion

Plaintiff's pending motion for partial summary judgment presents one issue for disposition: whether defendants' chain of command policy impermissibly violated the First Amendment to the United States Constitution. Defendants' pending motion for summary judgment is not quite as discriminating, and seeks foreclosure of all claims advanced by plaintiff in his amended complaint, specifically plaintiff's federal claims under the First Amendment and state law claims under the Pennsylvania Whistleblower Law, 43 PA. CONS. STAT. §§ 1421-28 ("Pennsylvania Whistleblower Law"), defamation, defamation *per se*, false light invasion of privacy and civil conspiracy. The court will analyze plaintiff's claims seriatim.

I.    **First Amendment**

Plaintiff's First Amendment claims consist of several alleged violations: the facial invalidity of Wilkins Township chain of command policy, creating a "hostile constitutional environment," retaliation against plaintiff for engaging in protected activity and violation of his rights to associate and to petition.

A.  **Chain of Command Policy**

As stated above, plaintiff's pending motion contemplates only the facial invalidity of the chain of command policy. Defendants, of course, argue it is valid. The court shall address this issue first.

On February 27, 2006, Wilkins Township issued a memorandum articulating its chain of command policy. The pertinent language for purposes of this lawsuit read as follows:

> It should be clear that, in no case, is an employee (other than the Township Manager) permitted to address issues to the Board of Commissioners (or any member thereof) without the express permission and/or knowledge of the Township Manager OR, in the case of members of the police and DPW workforce, the permission and knowledge of their immediate supervisors and the Township Manager. Obviously, this does not include issues which are not Township business (i.e. social relationships between Board members and employees).

(Pl.'s App. in Supp., Ex. 1.)

Plaintiff argues that this policy was impermissible as a prior restraint on employees' ability to communicate on matters of public concern and that the policy had a chilling effect on expression by plaintiff and employees of Wilkins Township. Defendants contend that this kind of policy used by government employers does not violate the First Amendment, nor did the policy at issue in this case violate the First Amendment "as applied" to plaintiff.

"Freedom of speech and expression occupies an exalted niche in the empyrean of personal liberties guaranteed by the Constitution." *Alderman v. Philadelphia Hous. Auth.*, 496 F.2d 164, 167 (3d Cir. 1974). "[C]ourts have remained particularly sensitive to governmental regulation that tends to impinge on expressive freedom." *Id.* at 168. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

At the same time, however, government employers must be given sufficient latitude to regulate employee conduct in order effectively and efficiently to carry out their operations.

> [A]lthough the Court has reiterated on numerous occasions that persons in public employment are not constitutionally compelled to relinquish the First Amendment rights they would otherwise enjoy to comment on matters of public interest, the Court has also cautioned that the public employee cannot engage in activity that impairs the efficiency of such public service.

*Trotman v. Bd. of Trustees of Lincoln Univ.*, 635 F.2d 216, 229 (3d Cir. 1980)(citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Thus, a delicate balance must be struck between these two competing yet important interests.

The majority of defendants' brief in opposition to plaintiff's motion is not responsive to the issue for which plaintiff seeks summary judgment. Plaintiff's motion addresses the constitutionality of the chain of command policy itself, asserting that it is overbroad and violative of the First Amendment. Defendants advance an argument that focuses upon various activities purportedly committed by plaintiff that served to provoke the operation of the policy, but does very little to develop a position about the constitutionality of the policy itself. Defendants' argument for upholding the policy is simply that neither the Supreme Court nor the United States

Court of Appeals for the Third Circuit has ever held a chain of command policy to be *per se* violative of the First Amendment, and that the Township's chain of command policy is constitutional because it is viewpoint neutral and a routine procedure to promote the efficient operation of the Township.

In furtherance of their defense of the policy, defendants accredit attributes to the policy that are simply not there. For example, nowhere can it be found in the policy, as defendants assert, that "[i]f the employee is unsatisfied with his supervisor's response, he remains free to appeal the matter to the next level in the chain of command." (Defs.' Br. at 15.) Nor does the policy make clear, as defendants urge, that "Township employees always have the right, as members of the community, to raise concerns to the Board when the floor is open to citizen's comments during a public meeting." *Id*. The plain language of the policy appears to suggest the exact opposite. "It should be clear that, **in no case**, is an employee (other than the Township Manager) permitted to address issues to the Board of Commissioners (or any member thereof) without the express permission and/or knowledge of the Township Manager. . . ." (Pl.'s App. in Supp., Ex. 1 (emphasis added).)

The stated goal of the Township's chain of command policy "is to avoid employees bypassing their supervisors on work-related issues, to maintain order and discipline, and to effectively alert superiors to potential problems." (Defs.' Br. in Opp.15.) While these are legitimate government concerns, regulations enacted for the purpose of realizing these goals can have no greater restrictive effect than necessary for their accomplishment. See *Gasparinetti v. Kerr*, 568 F.2d 311, 316 (3d Cir. 1977). With this objective in mind, the policy was crudely drafted. While the intent of Wilkins Township in promulgating the chain of command policy

may have been only to regulate the speech of employees pertaining to their employment, that is not what the policy says. It is easy to see how a Township employee may interpret the policy to prohibit protected expression. An employee may reasonably believe that in order to comply with the policy all communication with a board member at any time, on any subject, outside of some type of "social relationship," must be approved by the employee's supervisor or the Township manager. This court must be mindful that "[i]t is simply incompatible with the principles that underlie the First Amendment to countenance a policy that would severely circumscribe in this manner speech on public issues, which occupies the 'highest rung of the hierarchy of First Amendment values.'" *Czurlanis v. Albanese*, 721 F.2d 98, 105-06 (3d Cir. 1983)(quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)).

This court concludes that the Wilkins Township chain of command policy as defined in the board memorandum of February 27, 2006, is overbroad and violated the First Amendment. Plaintiff's motion for summary judgment will be granted in his favor with respect to the chain of command policy being violative of the First Amendment and defendants' motion with respect to that claim will be denied .

**B. "Hostile Constitutional Environment"**

Plaintiff's second claim under the First Amendment is that defendants created a "hostile Constitutional environment." Although the claim is not extensively developed in plaintiff's first amended complaint or addressed in defendants' brief in support of summary judgment, plaintiff attempted to clarify the claim in his brief in opposition. Based upon plaintiff's explanation, the "hostile Constitutional environment" claim appears to be derivative of the retaliation claim – the gist of it being that when defendants engage in a pattern of harassment consisting of a series of

14

adverse acts, each being comparatively inconsequential in its own right, section 1983 liability can be established based upon the aggregation of the negative conduct. Plaintiff details various actions by defendants which arguably support his claim. Without categorically recognizing a claim for "hostile Constitutional environment" as a separate claim, due to the dearth of authority available and the claim being inextricably linked to the retaliation claim, and subject to virtually the same analysis, the court will address the "hostile" claim in the context of the retaliation claim.

### C. Retaliation

Plaintiff's third First Amendment claim is retaliation. In order to maintain an action for First Amendment retaliation a public employee plaintiff must establish that the expression was protected by showing that, when making the statement, "(1) . . . the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement. . . . " *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (internal quotations omitted). The jurisprudential landscape for public employees making First Amendment retaliation claims has been somewhat altered since the United States Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). As the United States Court of Appeal for the Third Circuit recently observed, "*Garcetti* simply 'narrowed the Court's jurisprudence in the area of employee speech' by further restricting the speech activity that is protected." *Reilly v. Atlantic City*, 532 F.3d 216, 228 (3d Cir. 2008) (quoting *Foraker v. Chaffinch*, 501 F.3d 231, 241 (3d Cir. 2007)). The primary distinction in *Garcetti* affecting the public employee First Amendment retaliation claim analysis is that the

court must consider whether the employee speech is made pursuant to the employee's official duties. "[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Garcetti*, 547 U.S. at 424.

Despite plaintiff's insistence to the contrary, an exact and exhaustive description of plaintiff's job duties is not necessary to determine whether plaintiff's speech was made pursuant to his job duties.

> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti*, 547 U.S. at 424-25.

The court is tasked to determine whether or not the expressive activity engaged in by plaintiff was pursuant to his official duties as the chief of police of Wilkins Township. If they were, the speech is not protected and plaintiff's First Amendment retaliation claim must necessarily fail. If the speech at issue was not made within the job duties of chief of police, then the court must determine whether plaintiff was speaking as a citizen on a matter of public concern. If plaintiff was not speaking as a citizen, or if the speech did not involve a matter of public concern, then plaintiff's expressive activity falls outside the ambit of First Amendment protection. If, however, plaintiff was speaking as a citizen on a matter of public concern, then the court must "employ the *Pickering* balancing test to determine whether an employee's interest in the speech outweighs the state's countervailing interest as an employer in promoting workplace efficiency and avoiding workplace disruption." *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

The factual underpinnings of plaintiff's retaliation claim stem from plaintiff's protests of various actions committed by defendants Wilson, Bradley and Vargo between 2003 and 2005.[3] Specifically, plaintiff alleges defendants retaliated against him for his objections to requests by Wilson and Vargo to "fix" tickets, a request by Bradley to issue a key to the police department to a civilian employee, Bradley's interference with police department scheduling, Bradley's request to remove a disruptive citizen from the municipal building, Bradley's request that plaintiff turn over a "confidential" letter and Vargo's request that plaintiff write a proposal for traffic signal maintenance.

The applicability of the First Amendment to certain of these incidents is, obviously, easier to determine than the applicability to other incidents. With respect to plaintiff's exception to Bradley's interference with police department scheduling, plaintiff testified in his deposition that scheduling was one of the duties of the chief of police. In light of that testimony about scheduling, clearly anything said relating to scheduling would arise out of plaintiff's official duties. It follows, therefore, that plaintiff's objection to Bradley's interference with scheduling matters was made pursuant to his official duties, and was not entitled to First Amendment protection.

Regarding Bradley's request that plaintiff remove a disruptive citizen from the municipal building, the court notes that the extent, or existence, of plaintiff's expressive conduct in this incident is not clear. In plaintiff's first amended complaint and his declaration, plaintiff averred

---

[3]Plaintiff also alleges retaliation based on complaints he made against then Police Chief Wilson in 1997 and 1998. The court finds that these statements are too remote in time to be considered as a basis for plaintiff's retaliation claim now, especially in light of plaintiff's admission that no adverse employment actions were taken against him at the time, or any time, prior to 2003.

that after Bradley requested that the citizen be removed from the municipal building, the citizen voluntarily vacated the building and plaintiff responded to an emergency call. Plaintiff alleged that he was disciplined for failure to follow Bradley's order, "because he should have 'sensed' that Bradley wanted him to remove the citizen." (Pl.'s Am. Compl. ¶ 25; Pl.'s App. in Opp., Ex. A at 5-6.) It stands to reason that if plaintiff failed to "sense" the nature of Bradley's directive, his failure to act was due to a misapprehension of her wishes rather than a deliberate choice not to follow the command. A conscientious decision not to follow a superior's order does constitute an expression, i.e, is "speech," whereas an omission predicated upon a misunderstanding does not. Plaintiff indicates that he declined to follow the instruction because there was no legitimate basis for him to so act. This explanation denotes purposeful action consistent with expressive conduct, and because the court construes facts and draws reasonable inferences in the light most favorable to plaintiff on this claim, the court accepts that plaintiff's failure to follow Bradley's order was an expression.

Another difficulty with plaintiff's retaliation claim based upon this incident, is determining whether or not plaintiff was speaking as a citizen on a matter of public concern. Plaintiff's declaration describes the incident this way:

> In June 2004, a Township citizen visited my office to discuss possible drug trafficking in her neighborhood. Bradley entered my office and interrupted the conversation. Shortly thereafter, Bradley and the citizen began arguing, at which point Bradley stated that she thought the citizen should leave. The citizen left the building and I responded to an emergency call. Upon my return, Bradley reprimanded me for failing to follow her "order" to remove the citizen. She gave no such "order," and in any event, I did not believe there was a basis to force a citizen from the Township building who was discussing a Township issue and not violating any law or ordinance. I was formally reprimanded that same month for failure to follow Bradley's "order" to

remove the citizen, because I should have "sensed" that Bradley
wanted me to remove the citizen.

(Pl.'s App. in Opp., Ex. A. at 5-6.)  Based upon this statement, the court concludes that plaintiff's

message was his belief that the citizen's discussion of Township business in the Township

building should be allowed absent any violation of a law or ordinance.  It is conceivable that this

may approach the arena of public concern.

The fatal flaw to this claim, however, is the manner in which the expression was made.

Disregarding an order is only expressive when the individual being ordered is subject to the

authority of the individual giving the mandate.  The Township manager was not vested with the

authority to order the general citizenry around.  The Township manager, however, did have the

authority to give orders to the chief of police concerning his duties.  Plaintiff's failure to follow

Bradley's order is only expressive in that it was done in his capacity as chief of police.  The

expression, being made pursuant to plaintiff's official duties, is not entitled to First Amendment

protection.

The issue concerning the "confidential" letter is subject to a similar analysis to the extent

the claim is based on "taking direction from the township manager about how to handle a

confidential communication." (Pl.'s Br. in Opp. 8.)  Plaintiff's assertion in his first complaint,

that he was disciplined for withholding a "confidential police record," and advising Bradley of

that fact, is unavailing.  (Pl.'s Am. Compl. ¶¶ 31, 32.)  As an initial matter, plaintiff possessed

the letter in his position as chief of police.  Any communication on the subject of possession of

the letter, logically, would have been pursuant to his duties as the chief of police.  A

determination that a document is a "confidential police record" is one that would be made by a

member of the force, and not by a member of the community in general.  The court concludes

that, to the extent plaintiff claims First Amendment retaliation based upon speech related to the

letter, any expression arising from that incident was pursuant to plaintiff's official

responsibilities and not protected speech under the First Amendment.

Similarly, the occurrence involving Bradley's request that plaintiff issue a key to a

"civilian" employee that would grant access to the police department offices where confidential

police records were located is intrinsically related to plaintiff's official duties.  Wilkins Township

Resolution No. 4-77, defining the duties of police department personnel in effect during the time

relevant to this lawsuit, under the heading "Chief of Police," stated: "Supervises all police

department records."  (Defs.' App. in Opp., Ex. 14.)  Inherent in the supervision of the

department records is the responsibility to prohibit access to unauthorized persons.  Plaintiff

testified as follows:

> Q.  Okay.  And you supervise all police department records.
>     Is that what we talked about earlier?
> A.  Yes.
> Q.  You're responsible for maintaining the accuracy, the
>     completeness, the security of police records?
> A.  Correct.

(Guthrie Dep. 88-89.)

The only other reference to this incident in the record is a memorandum from plaintiff to

Bradley.  Although plaintiff's first amended complaint avers that this incident occurred on March

1, 2004, the memorandum is dated February 25, 2004.  Despite the discrepancy, the court

concludes that the February 25, 2004 memorandum and the March 1, 2004 allegation in

plaintiff's first amended complaint refer to the same incident, the specific details in each being

too strikingly similar to dismiss as mere coincidence. Tellingly, the memorandum was written

on Wilkins Township police department letterhead, and identified as being from "Chief Keith D.

Guthrie." The memorandum indicated plaintiff's reasons for failing to provide a key to a citizen

employee as directed by Bradley.

> I received your letter directing me to provide a key to Dave Geric giving
> him access to the Police Department. As we discussed yesterday, this
> order is in conflict with the Pennsylvania Crimes Code Section 9131
> directing criminal justice agencies to provide security for criminal history
> record information. It also gives access to C.L.E.A.N. information which
> is also against site security requirements by the PA State Police. I have
> also spoken with Agent Lenny Zenkel of the Attorney General's Office.
> He concurs that this would violate C.H.R.I.A. (Criminal History Records
> Information Act).

(Defs.' App. in Opp., Ex. 9.) The posture and tone of this memorandum clearly indicate that

plaintiff was speaking pursuant to his official duties, and not as a citizen on a matter of public

concern. The letterhead, the use of the title "Chief," and the objections pointing out requirements

of criminal justice agencies all lead to the inescapable conclusion that when plaintiff voiced his

concerns regarding a civilian having a key to the police department, he did so not as a citizen, but

as the chief of police. The speech was therefore unprotected, and plaintiff's claim cannot be

sustained on this ground.

Defendants suggest that plaintiff also asserts First Amendment retaliation based upon

Vargo's request that he write a traffic signal proposal. Plaintiff actually refers to this occurrence

as evidence of defendants' retaliation, rather than an instance of his engaging in protected

activity. The court need not analyze the expressive activity from that incident. (*See* Pl.'s Am.

Compl. ¶ 33.)

By far the most troubling episodes underlying plaintiff's First Amendment retaliation claim are the requests, or "orders," by defendants that plaintiff "fix" tickets and defendants imposing disciplinary action against him for refusing to do so and subsequently reporting the orders to the district attorney and the FBI. The record reveals that plaintiff was ordered by defendants Wilson and Vargo to "fix" tickets for an abandoned vehicle to an individual assisting the Township on Township business.[4] "We have made clear that '[s]peech involving government impropriety occupies the highest rung of First Amendment protection. Moreover, the public's substantial interest in unearthing governmental improprieties requires courts to foster legitimate whistleblowing.'" *Baldassare v. State of N.J.*, 250 F.3d 188, 198 (3d Cir. 2001) (quoting *Swineford v. Snyder County Pa.*, 15 F.3d 1258, 1274 (3d Cir. 1994); see *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 1994)) (alteration in original). Even considering this exalted status, if the speech was made pursuant to the public employee's official duties protected status will not be afforded. *Garcetti*, 547 U.S. at 425. Significantly, plaintiff's facsimile communication to the district attorney regarding this matter includes a Wilkins Township police department cover sheet and is indicated as being from Chief Keith D. Guthrie. (Defs.' App. in Supp., Ex. 16.) Plaintiff's memorandum to Bradley concerning the abandoned vehicle ticket incident is likewise on police letterhead and indicated as being from Chief Keith D. Guthrie. (Defs.' App. in Supp., Ex. 12.) In plaintiff's declaration he stated, "I therefore maintained my decision not to withdraw the ticket, as doing so would have been contrary to

---

[4]Although plaintiff's first amended complaint mentions three incidents, i.e., a non-specified incident in July 2003 in which Wilson ordered plaintiff to fix a ticket, Vargo's orders to fix a ticket issued for a garbage truck operating in violation of a Township ordinance, and the incident involving the ticket issued to the abandoned vehicle, only the last incident was developed in the record. It is also the only incident, as far as the record reveals, for which plaintiff was suspended or otherwise subject to retaliatory action.

police rules and regulations." (Pl.'s App. in Opp., Ex. A ¶ 25.)  For these reasons, the court concludes that plaintiff's expressive conduct in response to orders to "fix" tickets was pursuant to his duties as the chief of police, and is not protected under the First Amendment.

Because the court finds that all plaintiff's expressive activities were in conformity with his official responsibilities, First Amendment protection is not available, and summary judgment will be granted in favor of defendants with respect to these claims.

### D. Freedom of Association

To the extent that plaintiff raises a claim under the Freedom of Association guarantee of the First Amendment, this claim must fail.  Plaintiff's first amended complaint states that "his rights to associate with persons necessary to carry out his job duties, especially in the law enforcement community, are protected by the First Amendment to the United States Constitution." (Pl.'s Am. Compl. ¶ 63.)  Plaintiff avers that his suspensions and other adverse employment actions were effectuated, in part, to punish him for exercising his right of association.  Initially, the associational activity in which plaintiff alleges to have been engaged does not fall under the rubric of the First Amendment.  Plaintiff's position appears to be that his communications with other law enforcement officials, most notably, if not exclusively, the Allegheny County District Attorney and the FBI, concerning defendants' conduct amounted to an association that was subject to First Amendment protection.  Plaintiff contends that the communications to these officials represented protected speech.  Plaintiff's association claim is essentially an extension of his speech claim.  Even if the speech were protected, contrary to what the court has already decided, this is not the kind of association contemplated by the First Amendment.

The Supreme Court has stated,:

> [W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

*Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) (citing *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 907-09, 932-33 (1982); *Larson v. Valente*, 456 U.S. 228, 244-46 (1982); *In re Primus*, 436 U.S. 412, 426 (1978); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 231 (1977)).  The essence of the right is premised on a voluntary and mutual association for the purpose of engaging in activity protected by the First Amendment.  See *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 441 (3d Cir. 2000).  Merely directing speech at an individual does not create an association by adhesion with that individual if the speech is later challenged on First Amendment grounds.  Neither does the First Amendment protect a citizen "for associating with individuals who had grievances to report."  (Pl.'s Br. in Opp. 6.)  The purpose of such an "association" is not to engage in expressive activity, but merely to report the grievance.   Furthermore, plaintiff offered no precedential support for his argument that "his rights to associate with persons necessary to carry out his job duties" and his right to "associat[e] with individuals who had grievances to report" are cognizable under the First Amendment.  For these reasons, summary judgment must be granted in favor of defendants with respect to plaintiff's freedom of association claim.

### E.  Freedom to Petition

Plaintiff makes reference in his First Amended Complaint to "his attempts to obtain redress for unlawful actions through the use of lawful process."  (Pl.'s Am. Compl. ¶ 68.)  In

plaintiff's brief in opposition to defendants' motion, plaintiff stated: "Guthrie's approaches to Commissioners about wrongdoing by defendant Wilson when he was chief of police may be considered petitioning activity." (Pl.'s Br. in Opp. 6.) Plaintiff otherwise is silent with respect to the petition clause of the First Amendment. Even assuming plaintiff's attempt to invoke a claim under the First Amendment's Petition Clause was appropriate, the claim is barred by the applicable two-year statute of limitations. *Wilson v. Garcia*, 471 U.S. 261, 276 (1985); *Bartholomew v. Fischl*, 782 F.2d 1148, 1149 (3d Cir. 1986).

## II. Pennsylvania Whistleblower Law

Plaintiff's claim under the Pennsylvania Whistleblower Law is based upon his reports to the Allegheny County District Attorney and the FBI regarding defendants' orders that he "fix" tickets. Plaintiff's report to the Allegheny County District Attorney occurred on or about September 16, 2005. Plaintiff alleges that his suspension of October 13, 2005, related at least in part, to this report. Plaintiff's report to the FBI purportedly occurred on November 5, 2005. Plaintiff maintains that his December 13, 2005, suspension was partially due to this report to the FBI.

The Pennsylvania Whistleblower Law proscribes employers from discriminating or retaliating against an employee "because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste." 43 Pa. Cons. Stat. § 1423(a). A civil action brought for an alleged violation of the Pennsylvania Whistleblower Law must be commenced within 180 days of the occurrence of the violation. *Id.* "[T]his 180-day time limit is mandatory, and courts have no discretion to extend it." *O'Rourke v. Pennsylvania Dept. of*

*Corrections*, 730 A.2d 1039, 1042 (Pa. Commw. Ct.1999) (citing *Perry v. Tioga County*, 649 A.2d 186 (Pa. Commw. Ct. 1994), *appeal denied*, 655 A.2d 995 (Pa. 1995)).

Plaintiff filed his complaint on May 8, 2006. His suspension of October 13, 2005, occurring 207 days prior to the commencement of this action, cannot sustain a claim under the Pennsylvania Whistleblower Law because it is time-barred.

With respect to plaintiff's November 5, 2005 report to the FBI and December 13, 2005 suspension, his averments are insufficient to establish a claim under the Pennsylvania Whistleblower Act. To establish a claim there must be a causal connection between the activity and the adverse action. See *Golaschevsky v. Com., Dept. of Envtl. Prot.*, 720 A.2d 757, 759-60 (Pa. 1998). Plaintiff did not establish the requisite causal nexus between the report and the adverse employment action. *Id.* The record reveals that not one defendant was aware of plaintiff's report to the FBI prior to the commencement of this lawsuit, let alone prior to the decision to suspend him from duty in December 2005. Accordingly, summary judgment will be granted in favor of defendants on plaintiff's claims brought pursuant to the Pennsylvania Whistleblower Law.

**III.     State Law Tort Claims**

Plaintiff identifies four instances of communication containing statements attributable to defendant Bradley that serve as the foundation for his claims of defamation, defamation *per se*, and false light invasion of privacy. Two instances are derived from newspaper publications, which the parties agree cannot support the claims because they are barred by the one-year statute

of limitations.  See, e.g., 42 Pa. Cons. Stat. § 5523(1); *Abernethy v. Williams*, 584 A.2d 1085, 1087 (Pa. Commw. Ct. 1990).  Plaintiff argues, however, that the newspaper articles are germane as evidence of Bradley's intent to defame him and, for want of a better expression, her state of mind toward him during the relevant time.  The court's disposition of these claims does not require a decision on the relative merits of this position.

The remaining two instances concern e-mails authored by Bradley and sent to Bill Heltzel, a reporter for the *Pittsburgh Post-Gazette* newspaper, with copies to various persons in official positions with the Township.[5]  The January e-mail discussed disciplinary action taken by the Township against plaintiff.  The July e-mail related the events occurring at a Township meeting.

**A. Defamation**

In order to recover in a defamation action under Pennsylvania law, a plaintiff must show:

> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff from the publication.
> (7) The abuse of a conditionally privileged occasion.

*Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 903 (Pa. 2007).  "Caselaw further informs us that if the plaintiff is a public figure he or she must prove that the defendant published the offending statement with 'actual malice,' i.e., with knowledge that the statement was false or with reckless disregard of its falsity." *Id.* (citing *Curran v. Philadelphia Newspapers, Inc.*, 439

_____

[5]The e-mails, despite their vintage, arguably may not be time-barred because plaintiff did not unearth them until discovery in the instant action, less than a year before plaintiff's complaint was amended.

A.2d 652, 659 (Pa. 1981) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80

(1964))). It is well settled in Pennsylvania law that police officers are public figures. See, e.g.,

*Stickney v. Chester County Commc'ns, Ltd.*, 522 A.2d 66, 69 n.1 (Pa. Super. Ct. 1987) (citing

*Dunlap v. Philadelphia Newspapers, Inc.*, 448 A.2d 6 (Pa. Super. Ct. 1982); *Brophy v. Phila.*

*Newspapers, Inc.*, 422 A.2d 625 (Pa. Super. Ct. 1980)).

Turning to the operable statements for purposes of these claims, the court first notes that

only two statements in the January e-mail are at least potentially capable of defamatory meaning:

(1) the statement referring to spinning issues (the "spin" statement) and (2) the statement

referring to relaying half-truths to the media (the "half-truths" statement). In the July e-mail,

only one statement is even potentially capable of defamatory meaning: the statement referring to

spreading a little dirt (the "spreading dirt" statement).[6] Whether a statement is capable of a

defamatory meaning is a question of law for the court to decide in the first instance. See *Bell v.*

*Mayview State Hosp.*, 853 A.2d 1058, 1061-62 (Pa. Super. Ct. 2004).

The common understanding of what it means to "spin" issues is the selective relation of

facts concerning an event in such a way so as to portray matters in a manner most favorable to

the speaker. Although sometimes, if not often, used as a pejorative term, it cannot be said that

the term is used exclusively in that manner. Furthermore, it is not synonymous with outright

lying or dishonesty, although it may be suggestive of an individual who has an on-again/off-again

relationship with the truth. Either way, the allegation that a person "spins" issues does not

suffice for the court to find that "it tends to harm the reputation of another so as to lower him or

---

[6]At oral argument on this subject the court noted that the "spreading dirt" statement is the only statement
that "has any traction" for purposes of supporting a defamation claim. In an effort to discuss the issues in an
exhaustive manner, the other statements in the January e-mail will also be addressed.

her in the estimation of the community or to deter third persons from associating or dealing with him or her." *Bell v. Mayview State Hosp.*, 853 A.2d 1058, 1062 (Pa. Super. Ct. 2004) (citing *Feldman v. Lafayette Green Condominium Assoc.*, 806 A.2d 497, 500 (Pa. Commw. Ct. 2002)). Plaintiff adduced no evidence that any of those adverse impacts occurred in this case. Tellingly, the spin statement was preceded by the phrase, "[i]t is obvious to me . . ." as opposed to, say, for example, "As a matter of unequivocal truth and fact. . . ." The phrase "[i]t is obvious to me" connotes that what follows is the speaker's opinion. Statements of opinion are not actionable in Pennsylvania. "Only statements of fact, not expressions of opinion, can support an action in defamation." *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005) (citing *Elia v. Erie Ins. Exch.*, 634 A.2d 657, 660 (Pa. Super. Ct. 1993)).

A statement of opinion may be actionable, however, "if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." RESTATEMENT (SECOND) OF TORTS § 566. Such is not the case here. All the underlying facts were known to the recipients of the communication, those being the reporter and Township personnel. "Under Pennsylvania law a key factor is the nature of the audience reached by the publication." *Sellers v. Time, Inc.*, 423 F.2d 887, 890 ((3d Cir. 1970). Plaintiff adduced no evidence that he has suffered any harm as a result of Bradley's publication of the statement.

The half-truths statement from the same e-mail likewise represents Bradley's opinion. While it lacks the convenient introductory phrase, her statement about what "apparently, the Chief feels" can only represent her opinion on the subject. The audience reached by the communication was not deprived of undisclosed facts engendering the statement of Bradley's opinion. While an allegation of engaging in half-truths calls into question one's reputation for

29

veracity, the court cannot find on this record that the statement, read in context, is capable of a defamatory meaning. The court found no evidence of record that plaintiff suffered harm as a result of the statement.

The spreading dirt statement referred to an act at a meeting which plaintiff did not attend. Essentially, plaintiff is asking the court to build inference upon innuendo and find that Bradley's statement about what four other people did outside of plaintiff's presence, and with no implication that it was at plaintiff's request or insistence, "lower[ed] him . . . in the estimation of the community or . . . deter[red] third persons from associating or dealing with him . . ." *Bell*, supra. This court is not inclined to do. "In Pennsylvania . . . conduct by a defendant directed at a third party has never been held to support a plaintiff's cause of action for defamation." *Bargerstock v. Washington Greene Cmty. Action Corp.*, 580 A.2d 361, 363 n.1 (Pa. Super. Ct. 1990).

Although not necessary for the disposition of the defamation claim, the court notes that plaintiff has not shown the "actual malice" necessary to sustain a defamation cause of action for a public figure. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). For the foregoing reasons, summary judgment will be granted in favor of defendants with respect to plaintiff's defamation claim.

**B. Defamation *Per Se***

Plaintiff's defamation *per se* claim is based upon the same statements as his defamation claim, but arise under this claim because the communications concerned his fitness for his profession. A distinguishing characteristic of the defamation *per se* action is that a plaintiff need not prove actual damages as in the ordinary defamation action. *Franklin Prescriptions, Inc. v.*

*New York Times Co.*, 424 F.3d 336, 343 (3d Cir. 2005). A defamation *per se* plaintiff, however, must meet the burden of proof as to all other elements of the prima facie defamation case. 42 PA. CONS. STAT. § 8343(a). *A priori*, therefore, plaintiff's defamation *per se* claim must necessarily fail for the same reasons as the defamation claim because that claim was not dismissed based solely upon a failure to show damages. Summary judgment will be granted in favor of defendants with respect to this claim.

### C. False Light Invasion of Privacy

Plaintiff asserts a claim for false light invasion of privacy on the same factual groundwork as the two species of defamation claims. To support a claim for this tort a plaintiff must prove the elements of (1) publicity, (2) given to private facts, (3) which would be highly offensive to a reasonable person and (4) which are not of legitimate concern to the public. *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. Ct. 1997) (citing *Harris by Harris v. Easton Publ'g Co.*, 483 A.2d 1377, 1384 (Pa. Super. Ct. 1984)). Initially, the court finds that the statements attributable to Bradley that provide the foundation for plaintiff's false light invasion of privacy claim are not of such a character as to be "highly offensive to a reasonable person." "It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a cause of action for invasion of privacy." *Curran v. Children's Serv. Ctr. of Wyoming County*, 578 A.2d 8, 13 (Pa. Super. Ct. 1990). Plaintiff failed to establish the publicity element of his claim. "'Publicity,' as an element of the tort of invasion of privacy, 'means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Curran*, 578

31

A.2d at 12 (quoting RESTATEMENT (SECOND) OF TORTS § 652D, cmt a). Bradley's e-mail

message to the reporter and a few individuals holding positions with the Township did not reach

the required level of widespread dissemination necessary to recover on the claim. Plaintiff

argues that because the primary recipient of the messages was a newspaper reporter, the

communication was substantially certain to become a matter of public knowledge. The court

cannot accept that logic. First of all, the matter was not reported in the newspaper. Second,

plaintiff cited no precedent, and the court can find none, that there exists an inchoate version of a

claim for invasion of privacy. Because plaintiff failed to adduce evidence sufficient to sustain a

claim for false light invasion of privacy, summary judgment will be granted in favor of

defendants with respect to this claim.

## IV.     Civil Conspiracy

Plaintiff charges civil conspiracy against defendants Bradley and Vargo alleging that they

combined for the improper purposes of retaliating against him for engaging in protected activities

and harassing and intimidating him in an effort to coerce him into abandoning his position as the

chief of police.

> To state a cause of action for conspiracy, the complaint must allege the
> following: (1) combination of two or more persons acting with a common
> purpose to do an unlawful act or to do a lawful act by unlawful means or
> for an unlawful purpose; (2) overt act done in pursuance of common
> purpose; and (3) actual legal damage.

*Brown v. Blaine*, 833 A.2d 1166, 1173 n.16 (Pa. Commw. Ct. 2003) (citing *McKeeman v.*

*Corestates Bank, N.A.*, 751 A.2d 655 (Pa. Super. Ct. 2000)).

> A complaint alleging civil conspiracy must allege facts showing the
> existence of all the elements, and if the plaintiff is unable to allege facts
> that are direct evidence of the combination and its intent, he must allege

facts that, if proved, will support an inference of the combination and its intent.

*Id.* (citing *Baker v. Rangos*, 324 A.2d 498 (Pa. Super. Ct. 1974)). "Bare allegations of conspiracy, without more, are insufficient to survive a demurrer." *Id.* (citing *Petula v. Mellody*, 588 A.2d 103 (Pa.Commw. 1991)). There are numerous reasons why plaintiff's civil conspiracy claim cannot withstand summary judgment, many of which are discussed in defendants' brief. The court will limit its determination of the issue to the most facile reason. Plaintiff failed to adduce sufficient evidence to prove any element of a civil conspiracy claim. Plaintiff's claim is predicated on the occurrences of individual acts by Bradley and Vargo and "bolstered" by the happenstance that Bradley and Vargo cohabitate. Plaintiff notes, "Well, they live together. I mean, they could talk all night about me if they wanted." (Defs.' App. in Supp., Ex. 21, 109.) Their living arrangement, in and of itself, is not evidence of civil conspiracy. Plaintiff failed to adduce evidence to substantiate a claim for civil conspiracy, and summary judgment will be granted in favor of defendants with respect to this claim.

### V.      Qualified Immunity

Because the only claim surviving summary judgment is plaintiff's First Amendment claim against the constitutionality of the chain of command policy itself, the provenance of which is not attributable to any of the individual defendants, the individual defendants will be dismissed from this action. Therefore, the court need not adduce the issue of qualified immunity.

**<u>Conclusion</u>**

For the foregoing reasons, plaintiff's motion for partial summary judgment is granted, defendants' motion for summary judgment is denied with respect to the chain of command policy challenge, and granted in all other respects. Defendants Bradley, Vargo and Wilson are dismissed from the action.

By the court:

<u>/s/ JOY FLOWERS CONTI</u>
Joy Flowers Conti
United States District Judge

Dated: September 15, 2008

cc:     Counsel of record